AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

District of Columbia

In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*

INFORMATION ASSOCIATED WITH ONE ACCOUNT STORED AT PREMISES CONTROLLED BY GOOGLE, LLC PURSUANT TO 18 U.S.C. § 2703 FOR INVESTIGATION OF VIOLATIONS OF 18 U.S.C. §§ 1343, 1346, 1349

)
)
)
)
)
)
)

Case No. 24-sc-1943

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, hereby incorporated by reference.

located in the _____ Jurisdiction _____ District of _____ Columbia _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, hereby incorporated by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ❏ property designed for use, intended for use, or used in committing a crime;
- ❏ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1343 | (Wire Fraud) |
| 18 U.S.C. § 1346 | (Honest Services Fraud) |
| 18 U.S.C. § 1349 | (Conspiracy) |

The application is based on these facts:

See Affidavit in Support of the Application for Search Warrant

- ❏ Continued on the attached sheet.
- ❏ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Robert Bell, Special Agent
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____ telephone _____ *(specify reliable electronic means)*.

Date: ____09/23/2024____

_____
*Judge's signature*

City and state: ____Washington, D.C.____

Zia M. Faruqi, U.S. Magistrate Judge
_____
*Printed name and title*

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means          ☑ Original          ❏ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No.  24-sc-1943 |
| INFORMATION ASSOCIATED WITH ONE ACCOUNT STORED AT PREMISES CONTROLLED BY GOOGLE, LLC PURSUANT TO 18 U.S.C. § 2703 FOR INVESTIGATION OF VIOLATIONS OF 18 U.S.C. §§ 1343, 1346, 1349 | ) ) ) ) | |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____Jurisdiction of the_____ District of _____Columbia_____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A, hereby incorporated by reference.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B, hereby incorporated by reference.

**YOU ARE COMMANDED** to execute this warrant on or before  _____October 7, 2024_____        *(not to exceed 14 days)*
❏ in the daytime 6:00 a.m. to 10:00 p.m.   ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to  _____Zia M. Faruqui, U.S. Magistrate Judge_____
                                                                                                                    *(United States Magistrate Judge)*

❏ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
❏ for _____ days *(not to exceed 30)*   ❏ until, the facts justifying, the later specific date of  _____ .

Date and time issued:  _____09/23/2024_____          _____
                                                                                                    *Judge's signature*

City and state:  _____Washington, D.C._____          Zia M. Faruqui, U.S. Magistrate Judge
                                                                                                    *Printed name and title*

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| Return | | |
|---|---|---|
| Case No.:<br>  24-sc-1943 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date:  _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## **ATTACHMENT A**

This warrant applies to information associated with the Gmail account identified as heightsmar@gmail.com (the "SUBJECT ACCOUNT") that is stored at premises owned, maintained, controlled, or operated by Google LLC, a company that accepts service of legal process via their Law Enforcement Request System internet website.  The principal address for Google LLC is 1600 Amphitheatre Parkway, Mountain View, California 94043.

## ATTACHMENT B

### Particular Things to be Seized and Procedures
### to Facilitate Execution of the Warrant

**I.      Information to be disclosed by Google LLC ("PROVIDER") to facilitate execution of the warrant**

To the extent that the information described in Attachment A is within the possession, custody, or control of PROVIDER, including any records that have been deleted but are still available to PROVIDER, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), PROVIDER is required to disclose the following information to the government for the SUBJECT ACCOUNT listed in Attachment A:

a.      For the time period from January 1, 2015, to the present:  The contents of all communications and related transactional records for all PROVIDER services used by the SUBJECT ACCOUNT's subscriber/user (such as e-mail services, calendar services, file sharing or storage services, photo sharing or storage services, remote computing services, instant messaging or chat services, voice call services, or remote computing services, to include online productivity tools such as Google Calendar, Google Contacts, Google Docs (word processing); Google Drive (cloud storage); and Google Photos (photo sharing)), including but not limited to incoming, outgoing, and draft e-mails, messages, calls, chats, and other electronic communications; attachments to communications (including native files); source and destination addresses and header or routing information for each communication (including originating IP addresses of e-mails); the date, size, and length of each communication; and any user or device identifiers linked to each communication (including cookies);

b.      For the time period from January 1, 2015, to the present:  The contents of all other data and related transactional records for all PROVIDER services used by a SUBJECT ACCOUNT user (such as e-mail services, calendar services, file sharing or storage services, photo

sharing or storage services, remote computing services, to include online productivity tools such as Google Calendar, Google Contacts, Google Docs (word processing); Google Drive (cloud storage); and Google Photos (photo sharing)), including any information generated, modified, or stored by user(s) or PROVIDER in connection with the SUBJECT ACCOUNT (such as contacts, calendar data, images, videos, notes, documents, bookmarks, profiles, device backups, and any other saved information);

        c.      For the time period from January 1, 2015, to the present:  All PROVIDER records concerning the online search and browsing history associated with the SUBJECT ACCOUNT or its users (such as information collected through tracking cookies);

        d.      For the time period from January 1, 2015, to the present:  All records and other information concerning any document, or other computer file created, stored, revised, or accessed in connection with the SUBJECT ACCOUNT or by a SUBJECT ACCOUNT user, including the contents and revision history of each document or other computer file, and all records and other information about each connection made to or from such document or other computer file, including the date, time, length, and method of connection; server log records; data transfer volume; and source and destination IP addresses and port numbers;

        e.      All records regarding identification of the SUBJECT ACCOUNT, including names, addresses, telephone numbers, alternative e-mail addresses provided during registration, means and source of payment (including any credit card or bank account number), records of session times and durations (including IP addresses, cookies, device information, and other identifiers linked to those sessions), records of account registration (including the IP address, cookies, device information, and other identifiers linked to account registration), length of service and types of services utilized, account status, methods of connecting, and server log files;

f.      All records pertaining to devices associated with the SUBJECT ACCOUNT and software used to create and access the SUBJECT ACCOUNT, including device serial numbers, instrument numbers, model types/numbers, International Mobile Equipment Identities ("IMEI"), Mobile Equipment Identifiers ("MEID"), Global Unique Identifiers ("GUID"), Electronic Serial Numbers ("ESN"), Android Device IDs, phone numbers, Media Access Control ("MAC") addresses, operating system information, browser information, mobile network information, information regarding cookies and similar technologies, and any other unique identifiers that would assist in identifying any such device(s), including unique application numbers and push notification tokens associated with the SUBJECT ACCOUNT (e.g., Apple Push Notifications ("APN"), Google Cloud Messaging ("GCM"), Microsoft Push Notification Service ("MPNS"), Windows Push Notification Service ("WNS"), Amazon Device Messaging ("ADM"), Firebase Cloud Messaging ("FCM"), and Baidu Cloud Push);

g.      Basic subscriber records and login history (including, as described in 18 U.S.C. § 2703(c)(2), names, addresses, records of session times and durations, length of service and types of service utilized, instrument numbers or other subscriber numbers or identities, and payment information) concerning any PROVIDER account (including both current and historical accounts) ever linked to the SUBJECT ACCOUNT by a common e-mail address (such as a common recovery e-mail address), or a common telephone number, means of payment (*e.g.*, credit card number), registration or login IP addresses (during one-week period), registration or login cookies or similar technologies, or any other unique device or user identifier;

h.      For the time period from January 1, 2015, to the present:  All information held by PROVIDER related to the location and location history of the user(s) of the SUBJECT ACCOUNT, including geographic locations associated with the SUBJECT ACCOUNT (including

those collected for non-PROVIDER based applications), IP addresses, Global Positioning System ("GPS") information, and information pertaining to nearby devices, Wi-Fi access points, and cell towers;

i.    For the time period from January 1, 2015, to the present:   All records of communications between PROVIDER and any person regarding the SUBJECT ACCOUNT, including contacts with support services and records of actions taken; and

j.    Information about any complaint, alert, or other indication of malware, fraud, or terms of service violation related to the SUBJECT ACCOUNT or associated user(s), including any memoranda, correspondence, investigation files, or records of meetings or discussions about the SUBJECT ACCOUNT or associated user(s) (but not including confidential communications with legal counsel).

Within 14 days of the issuance of this warrant, PROVIDER shall deliver the information set forth above via United States mail, courier, or e-mail to the following:

Special Agent Robert Bell
U.S. Department of Agriculture
Office of Inspector General
3614 3rd Street W.
Bradenton, FL  34205
robert.bell@oig.usda.gov

**II.    Information to be seized by the government**

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of Title 18, United States Code, Section 1343; Title 18, United States Code, Section 1346; and Title 18, United States Code, Section 1349; as described in the affidavit submitted in support of this Warrant, including information pertaining to the following matters:

a.    Information that constitutes evidence of the identification or location of the user(s) of the SUBJECT ACCOUNT;

b.    Information that constitutes evidence concerning persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the criminal activity under investigation; or (ii) communicated with the SUBJECT ACCOUNT about matters relating to the criminal activity under investigation, including records that help reveal their whereabouts;

c.    Information that constitutes evidence indicating the SUBJECT ACCOUNT users' state of mind, e.g., intent, absence of mistake, or evidence indicating preparation or planning, related to the criminal activity under investigation;

d.    Information that constitutes evidence concerning how and when the SUBJECT ACCOUNT was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the SUBJECT ACCOUNT users;

e.    Information that constitutes evidence of undue influence exerted on the hiring of contractors by Panum Telecom. LLC and/or AttainX, Inc. for USDA contracts; and misappropriation of U.S. Government funds applied to said contracts;

f.   Records and communications related to the aforementioned criminal activity, to include:

    i.   Messages, photos and videos relating to Panum and AttainX contracts with the U.S. Department of Agriculture (USDA) Office of the Assistant Secretary for Civil Rights (OASCR);

    ii.   Messages, photos and videos containing communications between KIRK PERRY, ALICIA THOMPSON, JAMAREA GRANT, KAYLA JACKSON, CAMILLE PERRY, Panum personnel, AttainX personnel, and USDA personnel;

    iii.   Messages, photos and videos relating to financial transactions conducted by KIRK PERRY, ALICIA THOMPSON, JAMAREA GRANT, KAYLA JACKSON, and CAMILLE PERRY;

    iv.   Messages, photos and videos relating to assets held by KIRK PERRY, ALICIA THOMPSON, JAMAREA GRANT, KAYLA JACKSON, and CAMILLE PERRY;

    v.   Messages, photos and videos identifying the location of safety deposit boxes or other possible depositories for cash and other liquid assets which are identified in any way with KIRK PERRY, ALICIA THOMPSON, JAMAREA GRANT, KAYLA JACKSON, and CAMILLE PERRY; and

    vi.   Messages, photos and videos relating to tax returns for KIRK PERRY, ALICIA THOMPSON, JAMAREA GRANT, KAYLA JACKSON, and CAMILLE PERRY, to include businesses they control or operate.

**III.    Government procedures for warrant execution**

The United States government will conduct a search of the information produced by the PROVIDER and determine which information is within the scope of the information to be seized specified in Section II.  That information that is within the scope of Section II may be copied and retained by the United States.

Law enforcement personnel will then seal any information from the PROVIDER that does not fall within the scope of Section II and will not further review the information absent an order of the Court.  Such sealed information may include retaining a digital copy of all information received pursuant to the warrant to be used for authentication at trial, as needed.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH ONE ACCOUNT STORED AT PREMISES CONTROLLED BY GOOGLE, LLC PURSUANT TO 18 U.S.C. § 2703 FOR INVESTIGATION OF VIOLATIONS OF 18 U.S.C. §§ 1343, 1346, 1349 | SC No. 24-sc-1943 |

*Reference:*          *USAO Ref. # 2021R01471; Subject Account:  heightsmar@gmail.com*

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Robert Bell, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application for a search warrant for information which is associated with one account – that is, heightsmar@gmail.com ("SUBJECT ACCOUNT") – which is stored at premises controlled by Google, LLC ("PROVIDER"), an electronic communications services provider and/or remote computing services provider which is headquartered at/ which accepts service at 1600 Amphitheatre Parkway, Mountain View, California 94043.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require PROVIDER to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B, using the procedures described in Section III of Attachment B.

2.      I am a Special Agent with the United States Department of Agriculture, Office of Inspector General (USDA-OIG).  I have been in this position since 2006.  For four years prior to my current employment, I was a Special Agent with the Air Force Office of Special Investigations (AFOSI).

3.      As part of my duties as a USDA-OIG Special Agent, I investigate matters involving wire fraud, money laundering, theft of public funds, and other financial crimes which involve USDA programs, regulations, and/or personnel.  I have conducted or participated in numerous investigations involving said matters.

4.      As a federal agent, I am authorized to investigate violations of laws of the United States, and as a law enforcement officer I am authorized to execute warrants issued under the authority of the United States.

5.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and agencies.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant.  It does not set forth all of my knowledge, or the knowledge of others, about this matter.

6.      Based on my training and experience and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe that violations of Title 18, United States Code, 1343 (Wire Fraud), 1346 (Honest Services Fraud), and 1349 (Conspiracy) have been committed by KIRK PERRY (K. PERRY) and JAMAREA GRANT (GRANT).  There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, or fruits of these crimes further described in Attachment B.

## JURISDICTION

7.      This Court has jurisdiction to issue the requested warrant because it is a "court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A), and (c)(1)(A).  Specifically, the Court is a "district court of the United States…that - has jurisdiction over the offense being investigated."  18 U.S.C. § 2711(3)(A)(i).  As discussed more fully below, acts or omissions in furtherance of the offenses under investigation occurred within Washington, DC.  *See* 18 U.S.C. § 3237.

## BACKGROUND

### USDA OFFICE OF THE ASSISTANT SECRETARY OF CIVIL RIGHTS

8.      The USDA Office of the Assistant Secretary for Civil Rights (OASCR) is an independent office within USDA responsible for ensuring departmental compliance with applicable laws, regulations, and policies pertaining to civil rights and equitable treatment for USDA customers and employees.  The Assistant Secretary for Civil Rights reports directly to the Secretary and Deputy Secretary of Agriculture.

9.      The OASCR Center for Civil Rights Enforcement is responsible for receiving and investigating allegations of discrimination involving USDA employees and programs.   The organization is comprised of two directorates – the Employment Directorate and the Programs Directorate.  The former is focused on Equal Employment Opportunity (EEO) complaints filed against USDA agencies and offices.

10.      Within the Employment Directorate are three divisions – the Employment Complaints Division (ECD), the Employment Investigations Division (EID), and the Employment Adjudication Division (EAD).

3

11.     ECD assesses formal EEO complaints for acceptance or dismissal.  Accepted complaints are referred to EID for investigation.  ECD is also responsible for maintaining and transmitting complaint files as well as coordinating appeals with the Equal Employment Opportunity Commission (EEOC).

12.     EID employs a number of contractors to conduct and manage EEO investigations. EID investigators obtain documentary and testimonial evidence as needed and document failures by agencies and individuals to produce requested evidence.  EID is also responsible for generating Reports of Investigation (ROIs) that address issues accepted for investigation by ECD.  ROIs are reviewed by EID prior to release to ensure legal sufficiency.

13.     EAD is responsible for conducting independent and objective reviews of investigative findings and issuing corresponding Final Agency Decisions (FADs).  EAD is the primary consumer of EID ROIs.  The division also monitors settlements, ensures compliance by applicable parties, and addressees matters remanded for agency review by the EEOC.

## PROBABLE CAUSE

### OASCR BUDGET IRREGULARITIES AND CONTRACTS

14.     In January 2020, USDA-OIG received a referral from the U.S. Office of Special Counsel concerning OASCR.  The referral contained various allegations related to budget irregularities, including possible violations of the Anti-Deficiency Act, failure by OASCR to properly manage their appropriated budget for FY17, improper use of reimbursable funds, and a general lack of effective tracking and documentation for OASCR's investigative work. In addition to appropriated funds, OASCR receives supplemental funding via interagency agreements with other USDA offices and agencies to perform EEO services on their behalf.

15.    A review of OASCR's expenditures in 2017 disclosed the organization spent approximately $1.6 million on contracts for investigative work and approximately $3.249 million to "manage" those investigations - meaning it cost nearly twice as much to manage a case as investigate it.  Panum Telecom, LLC (Panum) received a substantial portion of the funds spent on contract management.  The company, primarily advertised as a telecommunications contractor, was awarded a $4 million contract to provide OASCR with hourly billable equal opportunity specialists and equal opportunity assistants to supplement EID by reviewing ROIs, assist EAD with writing FADs, and perform other duties as specified.  The associated contract, GS-00Q-14-OAD-S132, was initiated in August 2015 and concluded in March 2018.

16.    The Statement of Work (SOW) for the contract with Panum outlined OASCR's requirement for equal opportunity specialists to be J.D./non-licensed attorneys or similar with EEO legal experience and have specific knowledge of Federal sector EEO laws and regulations.  The requirement for equal opportunity assistants was to provide administrative support to the mission. The task order associated with the contract required Panum contractors to provide a variety of functions, including reviews of ROIs for legal sufficiency, making recommendations for changes and providing supporting legal opinions, performing compliance review work, accepting and dismissing complaints, drafting FADs, and performing any other related assigned work.  All work was required to be performed on-site at the Patriots Plaza Building in Washington, DC.  The billable rate for equal opportunity specialists was set at $82-$84 per hour, and the rate for equal opportunity assistants was set at approximately $56-$57 per hour, depending on the option year.

17.    OASCR was responsible for providing office equipment for the contractors including phones, printers, and computers configured and approved for use on the USDA network. Because the contract employees had access to confidential information protected by the Privacy

Act, each was required to sign a non-disclosure agreement and complete training on security awareness and Privacy Act protections.  Contract employees were not allowed to remove any materials from OASCR offices, including case files or their work product.  No contract employee in a key position could be replaced without submitting the replacement employee's resume and securing approval from the Contracting Officer Representative (COR) as well as the Contracting Officer (CO).

18.     Until his recent retirement, K. PERRY was a GS-15 Supervisory Equal Opportunity Specialist who served as Program Director for EAD.  He had frequently acted in other capacities within OASCR, including serving as director of OASCR's financial office.   PERRY was designated as the Technical Point of Contact / COR for the Panum contract.

19.     On or about March 2018, AttainX, Inc. (AttainX) took over the scope of work previously provided by Panum.  AttainX is primarily advertised as an information technology contractor.  Many Panum employees transitioned to the AttainX contract.  The associated task order, AG-3142-P-17-0087, has been succeeded by a series of contracts.  The most recent, 12314420C0052, remains funded into fiscal year 2023.

20.     The SOW for the AttainX contract contained similar provisions to those outlined in the Panum contract.  AttainX employees were required to work onsite fulltime for 40 hours per week, and were expressly prohibited from removing any materials from USDA, including case files and work product.  Due to the sensitive nature of the information handled, contract staff were required to sign a non-disclosure agreement and complete training on security awareness and Privacy Act protections.  The specified billable rate for equal opportunity specialists was not to exceed $84 per hour and the rate for equal opportunity assistants was not to exceed $57 per hour.  Contract employees in key positions could not be replaced or substituted without approval of both

6

the COR and CO, following a thorough review of the substituted individual's resume, credentials, and references.  PERRY was designated as the Technical Point of Contact / COR for the AttainX contract.

## IDENTIFICATION OF "GHOST" EMPLOYEES

21.     USDA agencies and offices use the Invoice Processing Platform (IPP) to maintain electronic copies of contract invoices.  USDA-OIG personnel directly accessed Panum's invoices to OASCR for the aforementioned contract via IPP.  Panum submitted monthly invoices to OASCR that listed the names and titles of contractor staff serving as equal opportunity specialists or equal opportunity assistants, as well as the quantity and price of billable hours worked by each. Attached to each invoice was an itemized report showing the dates and hours worked by each employee.

22.     Law enforcement reviewed Panum's invoices for the period October 2016 through December 2017, including hourly work claimed by the Panum contract personnel. Equal Opportunity Assistant GRANT consistently reported the highest number of billable hours throughout the review period.  GRANT reported cumulative totals of 150-250 hours of work each month.  Included were hours billed on October 10, 2016; December 26, 2016; February 20, 2017; and May 29, 2017; all of which were Federal holidays.

23.     Access to USDA facilities in the National Capital Region (NCR) is managed by the USDA Office of Safety, Security and Protection (OSSP) within Departmental Administration. OSSP uses the Enterprise Physical Access Control System (ePACS) to administer consolidated physical access controls at multiple sites.  Specifically, access to all entry points for the Jamie L. Whitten Building and USDA managed areas of Patriots Plaza in Washington, DC are controlled via card reader access.  USDA employees and contractors entering these facilities must possess

7

either a USDA LincPass Personal Identity Verification (PIV) card that has been added to ePACS or an ePACS site badge.

24.     On February 25, 2021, USDA-OIG personnel compiled a list of contract staff names from the Panum invoices and submitted them to OSSP to query their associated NCR access records for fiscal year 2017 (FY 2017).  Routine building access activity for OASCR employees and contractors would include card swipes at the Jamie L. Whitten Building and Patriots Plaza. Of 18 names initially submitted to OSSP, 5 produced no results at all and 1 was associated with access card activity that preceded FY 2017.  The remaining 12 either showed consistent or periodic access activity at Patriots Plaza that generally aligned with the date range they were billed for by Panum.  The five names that produced no card activity results were GRANT, A.G.[1], B.S.[2], ALICIA THOMPSON (THOMPSON) and CAMILLE PERRY (C. PERRY).  The name associated with card activity preceding FY 2017 was KAYLA JACKSON (JACKSON).

25.     On March 4, 2021, USDA-OIG personnel obtained an OASCR telephone directory dated February 2017.  The directory included contract staff, listing their title, room number and phone number.  A comparison of the phone directory to Panum's invoice for February 2017 disclosed 13 of 17 names on the invoice were listed in the directory (1 employee queried for access activity was no longer billed for by Panum in February 2017).  All of the 13 contractor names listed in the directory were associated with access card activity at Patriots Plaza.  Within the

---

[1] Further analysis of Panum invoices in IPP disclosed that A.G.'s last name changed between 2015 and 2017.  A subsequent query of A.G.'s other name produced consistent access activity at Patriots Plaza during FY 2017.

[2] A commercial database search disclosed a permutation of B.S.'s name that was hyphenated.  A subsequent query of B.S.'s other name produced access activity at Patriots Plaza during FY 2017.

directory document, their respective titles and contractor status were listed as were their assigned rooms and phone numbers, where applicable. GRANT, JACKSON, C. PERRY, and THOMPSON were not in the phone directory.

26.    On March 12, 2021, USDA-OIG personnel submitted a request to the USDA Office of Chief Information Officer (OCIO) requesting copies of system authorization access request forms on file for GRANT, JACKSON, C. PERRY, and THOMPSON.  System access forms are required for contractors to gain access to the USDA network and receive a USDA email address (e.g., first.last@ascr.usda.gov or first.last@usda.gov).  Given the sensitive nature of information handled by OASCR contractors and the terms of Panum's contract, all correspondence and transmittal of records had to occur on the USDA network.  An OCIO representative responded the same day that none of the four individuals queried had ever been enrolled in their HR system, which encompasses the EmpowHR/Person Model, Remedy, and Identity Management System applications.

27.    Information obtained during the course of the investigation indicates that GRANT and THOMPSON are related to K. PERRY.  Specifically, K. PERRY and THOMPSON cohabitate and are parents of two children.  GRANT is the son of K. PERRY's sister, C.P.

    a.    On March 8, 2021, USDA-OIG received a Traffic Crash Report from the Ohio Department of Public Safety (ODPS) in response to a public records request.  The report detailed an accident that occurred on May 13, 2016, in Beachwood, OH involving a 2001 Mazda sedan owned by Kirk Perry Co.  GRANT was listed as the operator of the vehicle.  The address listed for Kirk Perry Co. was 70 North Park Street, Oberlin, OH.

    b.    A Google search for GRANT's name produced a result on the website https://casetext.com summarizing a criminal case which involved the murder of Raymond

9

Perry in June 1999.  Within the article was a footnote that identified GRANT as one of Raymond Perry's grandchildren.  The incident took place at 70 North Park Street, Oberlin, OH.

        c.      USDA-OIG personnel submitted a request to the USDA Office of Human Resource Management (OHRM) in Departmental Management for copies of K. PERRY's designation of beneficiary forms.  OHRM reviewed K. PERRY's Electronic Official Personnel Folder (eOPF) and produced designations for unpaid compensation, 2007, Federal Employees' Group Life Insurance Program (FEGLI) benefits, and Federal Employees Retirement System (FERS) benefits, all dated August 6, 2007.  Consistently across all three documents, K. PERRY named THOMPSON as a beneficiary and described her relationship to him as "Mother of Children."  K. PERRY listed THOMPSON's address as 1410 W. 9th Street, Lorain, OH 44052.  He also named C.P. as a beneficiary and described her relationship to him as "Sister."  C.P.'s address was the same as the home address K. PERRY provided on all three forms - 70 N. Park Street, Oberlin, OH 44074.  Within two of the three documents, K. PERRY named two beneficiaries, describing his relationship with each as "Son."  Their addresses were the same as THOMPSON's.

28.      Panum invoices showed that GRANT, JACKSON, C. PERRY, and THOMPSON were all purportedly employed as contract Equal Opportunity Assistants during varying ranges of time beginning as early as December 30, 2014, and unanimously concluding when AttainX took over the scope of work in March 2018.  Panum billed for each individual at a unit price of $55.00-$57.45 per hour during this period.  Collectively, Panum billed a total of $672,021.97 for GRANT, JACKSON, C. PERRY and THOMPSON.

29.     AttainX invoices showed that GRANT was purportedly employed as a contract Equal Opportunity Assistant beginning in April 2018.  AttainX billed for GRANT at a unit price of $57.00 per hour.  From April 2018 through April 2019, AttainX billed a total of $96,900 for GRANT.  (Beginning in May 2019, itemized timesheet data for individual AttainX contractors was no longer uploaded in IPP).

### FINANCIAL TRANSACTIONS BETWEEN GRANT AND PERRY

30.     A review of Pathward/Metabank records disclosed that an account ending in -5066 was opened in GRANT's name on August 7, 2015.  Transaction records for the account ending in -5066 showed a total of $195,480 in periodic ACH direct deposits from Panum Group from August 19, 2015, to March 28, 2018.  From April 27, 2018, to November 3, 2022, $203,839 in periodic ACH transfers were made from AttainX to account ending in -5066.  Payments from Panum and AttainX accounted for 99% of all deposits in the account.

31.     From September 2, 2015, to March 26, 2020, a total of $124,444 in payments were made from the Pathward/Metabank account ending in -5066 to a PayPal account ending in -8807. From August 19, 2015, to October 6, 2022, $66,850 in ATM withdrawals were made from account ending in -5066.  From April 26, 2016, to October 21, 2022, $194,406 in cash back transactions were made at various Walmart stores using a debit card associated with account ending in -5066.

32.     A review of PayPal records shows that the account ending in -8807 was opened on June 19, 2008 as a business account in K. PERRY's name.  The business associated with the account was "NLGR (OYBA)," which is believed to stand for Next Level Grassroots Oberlin Youth Basketball Association.

33.     K. PERRY's PayPal account ending in -8807 received a total of $141,569 in payments from Metabank accounts held by GRANT and JACKSON from January 7, 2015, to

11

March 3, 2021. This accounted for approximately 75% of all deposits and 99% of payments received.  During the same period, a total of $51,542 in cash withdrawals were made from the account ending in -8807, including $14,733 withdrawn at or near casinos.  A significant portion of the remaining funds were spent on mobile phone bills and travel, to include Southwest airlines airfare, purchases from Priceline, and rental cars.

## USE OF THE SUBJECT ACCOUNT

34.     On November 16, 2020, USDA-OIG personnel submitted a request to the USDA OCIO for Personal Storage Table (PST) files associated with K. PERRY, GRANT, JACKSON, C. PERRY, and THOMPSON.  A PST file contains information about emails, contacts, calendar entries, and other functions of the Microsoft Outlook application which are associated with an individual user's account(s).  PST files did not exist in the USDA system for GRANT, C. PERRY, or THOMPSON.  OCIO was able to locate PST files for K. PERRY's and JACKSON's OASCR email accounts, which were subsequently submitted for digital forensic review.

35.     A review of emails from K. PERRY's PST file identified five emails that were sent from, sent to, or copied to the SUBJECT ACCOUNT from August 6, 2015, to December 11, 2015. All were either sent from, sent to, or copied to K. PERRY's OASCR address.  Some of the emails sent to/from the SUBJECT ACCOUNT contained information and/or records specifically relevant to GRANT's employment with Panum.  For example:

    a.     On December 12, 2015, a Panum human resources employee emailed K. PERRY at his OASCR address and copied the SUBJECT ACCOUNT.  The email was also sent to additional email addresses at Panum, including Assistant Director of Acquisitions DHAVID CAYANAN (CAYANAN).  The email attached an Amended Agreement for

Independent Contractor Services to be signed by GRANT. The email also included instructions for GRANT to sign and return the Amended Agreement to Panum.

36.     Four of the five emails identified the SUBJECT ACCOUNT as belonging to GRANT. Four of the five emails also copied jamareagrant@gmail.com and jamarea.grant@panum.com, which are email addresses known to be associated with GRANT.

37.     In response to a previous search warrant issued for grantjamarea@gmail.com, which is another email address known to be associated with GRANT, PROVIDER provided your Affiant with documents linking grantjamarea@gmail.com with "secondary email" accounts for account recovery purposes. One "secondary email" account linked with grantjamarea@gmail.com was the SUBJECT ACCOUNT.

38.     A review of emails received from PROVIDER pursuant to the aforementioned search warrant disclosed the following:

    a.     On October 6, 2015, account klplaw@yahoo.com[3] forwarded an email to jamareagrant@gmail.com that was sent from the SUBJECT ACCOUNT. The message from the SUBJECT ACCOUNT consisted of a forwarded email from a Panum human resources employee, originally sent on October 1, 2015. The employee requested that Grant sign an amendment to his independent contractor agreement. Attached to the message was a .pdf file entitled "Jamarea Grant Amended ICA."

    b.     On December 2, 2015, account klplaw@yahoo.com forwarded an email to jamareagrant@gmail.com that was sent from the SUBJECT ACCOUNT. The message

---

[3] Account klplaw@yahoo.com was also the subject of a previous search warrant and is known to be associated with K. PERRY.

13

from the SUBJECT ACCOUNT consisted of a forwarded email from CAYANAN sent earlier on December 2, 2015.  CAYANAN advised the recipients that K. PERRY had approved additional work hours for OASCR contractors until December 9, 2015. CAYANAN requested that the recipients provide him with the actual hours they worked on the preceding Monday and Tuesday.

      c.      On December 11, 2015, accounts jamareagrant@gmail.com and the SUBJECT ACCOUNT were copied on and received a series of emails sent from a Panum human resources employee and CAYANAN.  Also copied and listed as a recipient was kirk.perry@ascr.usda.gov.  The messages pertained to independent contractor agreement amendments for GRANT and required his signature on two attached .pdf files entitled "Jamarea Grant Amended ICA 12-09-15" and "Jamarea Grant Amended ICA 01-31-2016."

      d.      On February 16, 2016, account jamareagrant@gmail.com received an email from a Panum human resources employee.  The SUBJECT ACCOUNT was listed as a recipient for the same message.  The message pertained to extending Grant's contract with Panum to January 31, 2017, and requested his signature on an attached .pdf file entitled "Jamarea Grant Amended ICA 01-31-17."

      e.      On April 15, 2018, account jamareagrant@gmail.com sent an email to the SUBJECT ACCOUNT with the subject "Time sheet instructions."  Attached was a Microsoft Word document titled "Timesheet Instructions" that explained the process for documenting AttainX work hours via the website https://timesheet.attainx.com.

14

f.      On September 19, 2019, account grantjamarea@gmail.com received an email from the SUBJECT ACCOUNT that included an attached earning statement for GRANT from AttainX for the period August 1, 2019, to August 15, 2019.

g.      On October 25, 2019, account grantjamarea@gmail.com received an email from the SUBJECT ACCOUNT with the subject "NEW RESUME."  Attached was a Microsoft Word document titled "jamarea resume 2.0."  The document indicated GRANT was employed by Medical Specialties Distributors as a warehouse associate from July 2012 to March 2016, Villa as a retail associate from June 2016 to September 2017, and Old Navy as a retail associate from February 2018 to December 2018.

h.      On November 3, 2019, account grantjamarea@gmail.com received an email from the SUBJECT ACCOUNT that included an attached earning statement for GRANT from AttainX for the period October 1, 2019, to October 15, 2019.

i.      On November 21, 2019, account grantjamarea@gmail.com received a message from Google indicating the recovery email associated with the account was the SUBJECT ACCOUNT.

39.     During a September 4, 2024, voluntary interview with law enforcement, GRANT informed your Affiant that GRANT and K. PERRY regularly exchanged emails pertaining to GRANT's employment with Panum, including emails regarding the review and revision of draft FADs, using the SUBJECT ACCOUNT.  GRANT also identified the SUBJECT ACCOUNT as being one of GRANT's personal email accounts.

40.     In that same interview, GRANT admitted that he did not work more than 40 hours per week for Panum, even though time sheets reflected his being paid for overtime work

15

throughout the duration of his employment.  GRANT also represented that he no longer has access to the SUBJECT ACCOUNT.

41.     Neither USDA, nor Panum, nor AttainX has any record of work performed by GRANT using the SUBJECT ACCOUNT.

42.     Based on information obtained pursuant to this investigation, I know that documents and correspondence relevant to GRANT's employment with Panum and AttainX have been commingled in GRANT's work accounts as well the SUBJECT ACCOUNT.  Further, there is probable cause to believe that GRANT and coconspirators in this scheme used personal email accounts to orchestrate and/or monitor financial transactions involving transfer of proceeds from illicitly obtained contract funds.

43.     On April 4, 2024, and September 6, 2024, PROVIDER was served with a preservation letter under 18 U.S.C. § 2703(f) related to the SUBJECT ACCOUNT.

44.     Based in part on the information described herein, a grand jury returned an indictment charging K. PERRY and GRANT with 18 U.S.C. § 1349 (Conspiracy) and 18 U.S.C. §§ 1343, 1346, 2 (Wire Fraud and Aiding and Abetting) on May 9, 2024.

## BACKGROUND CONCERNING PROVIDER'S ACCOUNTS

45.     PROVIDER is the provider of the internet-based account identified by heightsmar@gmail.com.

46.     PROVIDER provides its subscribers internet-based accounts that allow them to send, receive, and store e-mails online.  PROVIDER accounts are typically identified by a single username, which serves as the subscriber's default e-mail address, but which can also function as a subscriber's username for other PROVIDER services, such as instant messages and remote photo or file storage.

16

47.    Based on my training and experience, I know that PROVIDER allows subscribers to obtain accounts by registering on PROVIDER's website.   During the registration process, PROVIDER asks subscribers to create a username and password, and to provide basic personal information such as a name, an alternate e-mail address for backup purposes, a phone number, and in some cases a means of payment.   PROVIDER typically does not verify subscriber names. However, PROVIDER does verify the e-mail address or phone number provided.

48.    Once a subscriber has registered an account, PROVIDER provides e-mail services that typically include folders such as an "inbox" and a "sent mail" folder, as well as electronic address books or contact lists, and all of those folders are linked to the subscriber's username. PROVIDER subscribers can also use that same username or account in connection with other services provided by PROVIDER, including online productivity tools such as Google Calendar, Google Contacts, Google Docs (word processing); Google Drive (cloud storage); and Google Photos (photo sharing).

49.    In general, user-generated content (such as e-mail) that is written using, stored on, sent from, or sent to a PROVIDER account can be permanently stored in connection with that account, unless the subscriber deletes the material.   For example, if the subscriber does not delete an e-mail, the e-mail can remain on PROVIDER's servers indefinitely. Even if the subscriber deletes the e-mail, it may continue to exist on PROVIDER's servers for a certain period of time.

50.    Thus, a subscriber's PROVIDER account can be used not only for e-mail but also for other types of electronic communication, including instant messaging and photo and video sharing.  Depending on user settings, user-generated content derived from many of these services is normally stored on PROVIDER's servers until deleted by the subscriber.  Similar to e-mails, such user-generated content can remain on PROVIDER's servers indefinitely if not deleted by the

17

subscriber, and even after being deleted, it may continue to be available on PROVIDER's servers for a certain period of time. Furthermore, a PROVIDER subscriber can store contacts, calendar data, images, videos, notes, documents, bookmarks, web searches, browsing history, and various other types of information on PROVIDER's servers. Based on my training and experience, I know that evidence of who controlled, used, and/or created a PROVIDER account may be found within such computer files and other information created or stored by the PROVIDER subscriber. Based on my training and experience, I know that the types of data discussed above can include records and communications that constitute evidence of criminal activity.

51. Based on my training and experience, I know that providers such as PROVIDER also collect and maintain information about their subscribers, including information about their use of PROVIDER services. This information can include the date on which the account was created, the length of service, records of log-in (*i.e.*, session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account. Providers such as PROVIDER also commonly have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with other logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which devices were used to access the relevant account. Also, providers such as PROVIDER typically collect and maintain location data related to subscriber's use of PROVIDER services, including data derived from IP addresses and/or Global Positioning System ("GPS") data.

52. Based on my training and experience, I know that providers such as PROVIDER also collect information relating to the devices used to access a subscriber's account – such as

18

laptop or desktop computers, cell phones, and tablet computers. Such devices can be identified in various ways. For example, some identifiers are assigned to a device by the manufacturer and relate to the specific machine or "hardware," some identifiers are assigned by a telephone carrier concerning a particular user account for cellular data or voice services, and some identifiers are actually assigned by PROVIDER in order to track what devices are using PROVIDER's accounts and services. Examples of these identifiers include unique application number, hardware model, operating system version, Global Unique Identifier ("GUID"), device serial number, mobile network information, telephone number, Media Access Control ("MAC") address, and International Mobile Equipment Identity ("IMEI"). Based on my training and experience, I know that such identifiers may constitute evidence of the crimes under investigation because they can be used (a) to find other PROVIDER accounts created or accessed by the same device and likely belonging to the same user, (b) to find other types of accounts linked to the same device and user, and (c) to determine whether a particular device recovered during course of the investigation was used to access the PROVIDER account.

53.     PROVIDER also allows its subscribers to access its various services through an application that can be installed on and accessed via cellular telephones and other mobile devices. This application is associated with the subscriber's PROVIDER account. In my training and experience, I have learned that when the user of a mobile application installs and launches the application on a device (such as a cellular telephone), the application directs the device in question to obtain a Push Token, a unique identifier that allows the provider associated with the application (such as PROVIDER) to locate the device on which the application is installed. After the applicable push notification service (*e.g.*, Apple Push Notifications (APN) or Google Cloud Messaging) sends a Push Token to the device, the Token is then sent to the application, which in

19

turn sends the Push Token to the application's server/provider. Thereafter, whenever the provider needs to send notifications to the user's device, it sends both the Push Token and the payload associated with the notification (*i.e.*, the substance of what needs to be sent by the application to the device). To ensure this process works, Push Tokens associated with a subscriber's account are stored on the provider's server(s). Accordingly, the computers of PROVIDER are likely to contain useful information that may help to identify the specific device(s) used by a particular subscriber to access the subscriber's PROVIDER account via the mobile application.

54.     Based on my training and experience, I know that providers such as PROVIDER use cookies and similar technologies to track users visiting PROVIDER's webpages and using its products and services. Basically, a "cookie" is a small file containing a string of characters that a website attempts to place onto a user's computer. When that computer visits again, the website will recognize the cookie and thereby identify the same user who visited before. This sort of technology can be used to track users across multiple websites and online services belonging to PROVIDER. More sophisticated cookie technology can be used to identify users across devices and web browsers. From training and experience, I know that cookies and similar technology used by providers such as PROVIDER may constitute evidence of the criminal activity under investigation. By linking various accounts, devices, and online activity to the same user or users, cookies and linked information can help identify who was using a PROVIDER account and determine the scope of criminal activity.

55.     Based on my training and experience, I know that PROVIDER maintains records that can link different PROVIDER accounts to one another, by virtue of common identifiers, such as common e-mail addresses, common telephone numbers, common device identifiers, common computer cookies, and common names or addresses, that can show a single person, or single group

of persons, used multiple PROVIDER accounts.  Based on my training and experience, I also know that evidence concerning the identity of such linked accounts can be useful evidence in identifying the person or persons who have used a particular PROVIDER account.

56.     Based on my training and experience, I know that subscribers can communicate directly with PROVIDER about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users.  Providers such as PROVIDER typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications.  In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

57.     In summary, based on my training and experience in this context, I believe that the computers of PROVIDER are likely to contain user-generated content such as stored electronic communications (including retrieved and unretrieved e-mail for PROVIDER subscribers), as well as PROVIDER-generated information about its subscribers and their use of PROVIDER services and other online services.  In my training and experience, all of that information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.  In fact, even if subscribers provide PROVIDER with false information about their identities, that false information often nevertheless provides clues to their identities, locations, or illicit activities.

58.     As explained above, information stored in connection with a PROVIDER account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element

of the offense, or, alternatively, to exclude the innocent from further suspicion. From my training and experience, I know that the information stored in connection with a PROVIDER account can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, e-mail communications, contacts lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time. Further, information maintained by PROVIDER can show how and when the account was accessed or used. For example, providers such as PROVIDER typically log the IP addresses from which users access the account along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the PROVIDER account access and use relating to the criminal activity under investigation. This geographic and timeline information may tend to either inculpate or exculpate the person who controlled, used, and/or created the account. Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (*e.g.*, location information integrated into an image or video sent via e-mail). Finally, stored electronic data may provide relevant insight into the user's state of mind as it relates to the offense under investigation. For example, information in the PROVIDER account may indicate its user's motive and intent to commit a crime (*e.g.*, communications relating to the crime),

or consciousness of guilt (*e.g.*, deleting communications in an effort to conceal them from law enforcement).[4]

59.     Based on my training and experience, I know that evidence of who controlled, used, and/or created a PROVIDER account may be found within the user-generated content created or stored by the PROVIDER subscriber.  This type of evidence includes, for example, personal correspondence, personal photographs, purchase receipts, contact information, travel itineraries, and other content that can be uniquely connected to a specific, identifiable person or group.  In addition, based on my training and experience, I know that this type of user-generated content can provide crucial identification evidence, whether or not it was generated close in time to the offenses under investigation.  This is true for at least two reasons.  First, people that commit crimes involving electronic accounts (*e.g.*, e-mail accounts) typically try to hide their identities, and many people are more disciplined in that regard right before (and right after) committing a particular crime.  Second, earlier-generated content may be quite valuable, because criminals typically improve their tradecraft over time.  That is to say, criminals typically learn how to better separate their personal activity from their criminal activity, and they typically become more disciplined about maintaining that separation, as they become more experienced.  Finally, because e-mail accounts and similar PROVIDER accounts do not typically change hands on a frequent basis,

---

[4] At times, internet services providers such as PROVIDER can and do change the details and functionality of the services they offer.  While the information in this section is true and accurate to the best of my knowledge and belief, I have not specifically reviewed every detail of PROVIDER's services in connection with submitting this application for a search warrant.  Instead, I rely upon my training and experience, and the training and experience of others, to set forth the foregoing description for the Court.

identification evidence from one period can still be relevant to establishing the identity of the account user during a different, and even far removed, period of time.

## REQUEST TO SUBMIT WARRANT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

60.     I respectfully request, pursuant to Rules 4.1 and 41(d)(3) of the Federal Rules of Criminal Procedure, permission to communicate information to the Court by telephone in connection with this Application for a Search Warrant. I submit that Assistant U.S. Attorney Brian Kelly, an attorney for the United States, is capable of identifying my voice and telephone number for the Court.

## CONCLUSION

61.     Based on the forgoing, I request that the Court issue the proposed search warrant. Because the warrant will be served on PROVIDER, who will then compile the requested records at a time convenient to it, there exists reasonable cause to permit the execution of the requested warrant at any time in the day or night.  Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

Respectfully submitted,

Robert Bell
Special Agent
U.S. Department of Agriculture
Office of Inspector General

Subscribed and sworn pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on September 23, 2024.

HONORABLE ZIA M. FARUQUI
UNITED STATES MAGISTRATE JUDGE

24